J-E02004-25

2026 PA Super 75

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| JAMAL R. SANDERS | : | No. 2549 EDA 2022 |

Appeal from the PCRA Order Entered September 12, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-1010881-1997

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., OLSON, J., STABILE, J.,
KUNSELMAN, J., MURRAY, J., KING, J., SULLIVAN, J., and LANE, J.

OPINION BY KING, J.:                    **FILED APRIL 17, 2026**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Philadelphia County Court of Common Pleas, which granted the petition filed pursuant to the Post Conviction Relief Act ("PCRA")[1] of Appellee, Jamal R. Sanders, and awarded Appellee a new trial.  We affirm.

The PCRA court set forth the relevant facts and procedural history of this case as follows:

> On September 5, 1997, police responded to a radio call reporting a shooting.  The victim, Ronnie Johnson ("Johnson"), had been shot outside of a barbershop and died as a result of his injuries.  Based on a homicide investigation that followed this incident, police arrested two suspects: Appellee and Keane Tucker ("Tucker").[2]  Cephus [Houser] ("Houser") would inform police that [Appellee] and Tucker had arrived at the barbershop and argued with Johnson prior

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

[2] Tucker is sometimes referred to in the record as "Keane Tate" or "Keen Tate." For consistency, we will continue to use the name Tucker.

to the shooting.

Appellee was eventually arrested and went to [a] jury trial before the Honorable James A. Lineberger, after which he was convicted of third-degree murder, flight to avoid prosecution, criminal conspiracy, and possession of an instrument of crime. The Commonwealth's theory was that Appellee did not shoot the victim but had conspired [with Tucker], was present at the shooting, and provided the murder weapon [to Tucker]. At trial, the Commonwealth presented the testimony of Houser and Shawn Clark ("Clark"). Houser testified that two men, including Appellee, had arrived at the barbershop with guns and that Johnson was shot twice, though he did not know if both men shot Johnson or if one of the attackers shot Johnson twice. The Commonwealth also presented ballistics evidence that proved that both shots that killed Johnson were fired from the same gun [and that the shots both came from the side of Johnson where Houser had testified that Tucker was standing]. Clark testified that several weeks prior to Johnson's murder, Appellee had loaned Clark the same gun that had been used to murder Johnson[, and testified that he later returned the gun to Appellee], tying Appellee in conspiracy to Johnson's murder. [In closing argument, the Commonwealth emphasized Appellee's return of the gun to Clark; specifically, the assistant district attorney stated that the "gun that was handed out for use to [Clark] three weeks before now demonstratively has been handed over for use to … Tucker in this case." (N.T. Trial, 11/12/98, at 144).]

Appellee appealed his conviction to the Pennsylvania Superior Court, and his judgment of sentence was affirmed on September 8, 2003. Appellee did not seek Allowance of Appeal to the Pennsylvania Supreme Court. On January 8, 2020, [PCRA counsel] entered his appearance on Appellee's matter and filed a PCRA Petition on Appellee's behalf. [The PCRA] court found relevant questions existed which necessitated an evidentiary hearing held on September 23, 2021 and September 27, 2021. At the evidentiary hearing testimony was presented from witnesses Robert Nixon ("Nixon"), private investigator Ronald Felder ("Felder"), and Tucker. Further, as Clark had passed away two weeks after submitting a sworn affidavit, his affidavit was admitted into evidence and considered by [the PCRA] court.

At the evidentiary hearing, Nixon testified that he had been friends with both Appellee and Clark for decades and that, in June of 2019, Clark and Nixon attended the same barbeque where Clark told Nixon that Clark had testified falsely against Appellee at trial.[3] Private Investigator Felder testified regarding his efforts to speak with Houser about what happened on the day Johnson was murdered. Felder stated that when he met with Houser that Houser first asked if he was going to be compensated for his time, asking "what's in it for me" and became rude and standoffish after being told that no one would be compensating him for his time. Felder then testified that, after informing Houser that there was no compensation for providing information regarding Appellee's case, Houser voluntarily stated that Appellee shot Johnson in the back of the head which completely conflicted with Houser's trial testimony. Tucker testified to a variety of information, the most significant of which being that Tucker himself shot and killed Johnson, not Appellee, that Tucker had shot Johnson twice, and that Houser was not outside when the shooting occurred and

_____

[3] Specifically, Nixon testified, *inter alia*, that Clark approached him in June of 2019 and told Nixon that Appellee was incarcerated for something he did not do because of Clark, and that it was really bothering Clark. Clark told Nixon that police had taken Clark out of a youth correctional facility in the middle of the night, handcuffed him, and took him to the police station. Clark said that police told him that a firearm Clark had been charged with using in another crime about a month before Johnson's murder, a shooting on the 1500 block of Gratz Street, was used in the Johnson murder, and that if Clark did not tell police what they wanted to hear, then police would charge Clark in connection with the murder. Clark was about 16 years old at the time, and police made Clark sign a statement without a guardian or counsel present that implicated Appellee. Police told Clark that he would receive favorable treatment if he cooperated. Nixon further stated that prior to seeing Clark in June of 2019, Nixon had not seen Clark in approximately 15 years, because shortly after Appellee's trial, Clark left the neighborhood. Nixon contacted Appellee's wife about this conversation shortly thereafter. (**See** PCRA Hearing, 9/23/21, at 16-35).

thus could not have observed the shooting.[4]

> On September 8, 2022, after the PCRA hearings and numerous supporting briefs filed by [the Commonwealth] and Appellee, this court vacated Appellee's sentence and ordered a new trial. On September 29, 2022, [the Commonwealth] filed a Notice of Appeal to the Pennsylvania Superior Court, followed by a [Rule] 1925(b) Statement filed on October 19, 2022.

(PCRA Court Opinion, 12/27/22, at 1-3) (internal citations and footnotes omitted).

On January 8, 2025, a three-judge panel of this Court reversed the order granting PCRA relief, with one dissent. Appellee subsequently filed a petition for reargument before an *en banc* panel of this Court. On March 21, 2025, this Court granted the request for *en banc* reargument and withdrew the January 8, 2025 decision. The parties have filed supplemental briefs in this appeal.

The Commonwealth raises the following claim for our review:

> Did the PCRA court err in granting a new trial in this decades-old murder case based on an alleged newly-discovered statement that: (1) was hearsay and not admissible under the statement-against-interest exception; and (2) did not even exonerate [Appellee]?

_____

[4] Later in its opinion, the PCRA court makes clear that it did not award a new trial based on either Felder's testimony (concerning what Houser had said to him) or Tucker's testimony at the PCRA hearing. The PCRA court concluded that testimony from Tucker at the PCRA hearing would not overcome the newly-discovered facts exception to the PCRA time-bar. The PCRA court further concluded that it did not consider Felder's testimony about Houser as a basis for granting relief to Appellee.

(Commonwealth's Brief at 4).

The scope and standard of review of an order granting PCRA relief are well settled. "Our scope of review 'is limited to the PCRA court's findings and evidence of record,' viewed here in the light most favorable to [Appellee] as the party who prevailed before the PCRA court." **Commonwealth v. Robinson**, 278 A.3d 336, 340 (Pa.Super. 2022) (quoting **Commonwealth v. E. Small**, 662 Pa. 309, 330, 238 A.3d 1267, 1280 (2020)). "[O]ur standard of review calls for us to determine whether the ruling of the PCRA court is supported by the record and free of legal error." **Id.** (quoting **Commonwealth v. Wharton**, 669 Pa. 625, 634, 263 A.3d 561, 567 (2021)). This Court grants great deference to the factual findings of the PCRA court if the record contains any support for those findings. **Commonwealth v. Dozier**, 208 A.3d 1101, 1103 (Pa.Super. 2019). "[W]e review the court's legal conclusions *de novo*." **Commonwealth v. Prater**, 256 A.3d 1274, 1282 (Pa.Super. 2021).

Preliminarily, the timeliness of a PCRA petition is a jurisdictional requisite. **Commonwealth v. Zeigler**, 148 A.3d 849, 853 (Pa.Super. 2016). A PCRA petition, including a second or subsequent petition, shall be filed within one year of the date the underlying judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence is final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of

time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). The statutory exceptions to the PCRA time-bar allow very limited circumstances to excuse the late filing of a petition; a petitioner must also assert the exception within the time allowed under the statute. 42 Pa.C.S.A. § 9545(b)(1) and (b)(2).

To obtain merits review of a PCRA petition filed more than one year after the judgment of sentence became final, the petitioner must allege and prove at least one of the three timeliness exceptions:

> (i)      the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii)      the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii)      the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S.A. § 9545(b)(1)(i)-(iii).

This Court has explained:

> The timeliness exception set forth in Section 9545(b)(1)(ii), also known as the "newly-discovered fact" exception, requires a petitioner to plead and prove: (1) [he] did not know the fact(s) upon which [he] based [his] petition; and (2) [he] could not have learned those fact(s) earlier by the exercise of due diligence. Due diligence demands the petitioner to take reasonable steps to protect [his] own interests.… A petitioner must explain why [he] could not have learned the new fact earlier with the exercise of due diligence.

*Commonwealth v. Shiloh*, 170 A.3d 553, 557-58 (Pa.Super. 2017) (internal citations and footnote omitted).

Instantly, this Court affirmed Appellee's judgment of sentence on September 8, 2003. Thus, Appellee's judgment of sentence became final on October 8, 2003, after expiration of the time to file a petition for allowance of appeal in our Supreme Court. *See* Pa.R.A.P. 1113(a) (allowing 30 days to file petition for allowance of appeal in our Supreme Court). *See also* 42 Pa.C.S.A. § 9545(b)(3). Appellee had until October 8, 2004, to file a timely PCRA petition. *See* 42 Pa.C.S.A. § 9545(b)(1). Appellee filed the current PCRA petition on January 8, 2020, which is facially untimely.

To overcome the jurisdictional hurdle, Appellee invoked the "newly-discovered facts" exception, claiming that he filed his PCRA petition within one year of learning about Clark's recantation, which Appellee maintains he could not have discovered sooner with the exercise of due diligence. The PCRA court evaluated Appellee's invocation of the "newly-discovered facts" exception and found that Clark's proffered recantation testimony satisfied the requirements of the exception. (*See* PCRA Court Opinion at 6, 10) (explaining that Clark provided information to Nixon in May/June 2019; only possible way Appellee could have learned about Clark's recantation would have been for Clark or detectives to reveal it prior or during trial; thus, it is clear Appellee could not have learned these proffered new facts sooner with exercise of due diligence).

The parties and the PCRA court agree that Clark's recantation statement satisfies the newly-discovered fact exception.[5] On this record, we agree that Clark's recantation was a new fact that Appellee could not have discovered sooner with the exercise of due diligence. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). *See also Commonwealth v. Richardson*, No. 1744 EDA 2019 (Pa.Super. filed May 3, 2021) (unpublished memorandum)[6] (holding appellant satisfied newly-discovered facts exception to time-bar where nothing in record suggested that witness's admission of deal for leniency in exchange for her testimony or general recantation of trial testimony were facts previously known to appellant; witness testified at PCRA hearing that she had never told anyone about plea deal until that time; further, this Court would find it untenable and unreasonable to impose standard on PCRA petitioners that would require them to continually harass Commonwealth's witness for decades after conviction in order to satisfy due diligence requirement in event that said witness eventually comes forward to recant or provide new evidence).

Having found that Appellee's claim satisfied the newly-discovered fact exception to the PCRA time-bar, we turn to the merits of Appellee's claim of

---

[5] The Commonwealth agreed that this evidence satisfied the newly-discovered fact exception. (*See* Commonwealth's Post-Hearing Brief, filed 6/23/22, at 5 n.3).

[6] *See* Pa.R.A.P. 126(b) (explaining that we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

after-discovered evidence. On appeal, the Commonwealth contends that the PCRA court erred in granting relief because Clark's statement was inadmissible hearsay evidence. Specifically, the Commonwealth maintains that Clark's proffered recantation testimony was not admissible under the statement-against-interest hearsay exception. The Commonwealth emphasizes that the PCRA court acknowledged that Clark's testimony, offered by way of Nixon, was hearsay and would be inadmissible at a new trial unless an exception to the rule against hearsay applied. The Commonwealth claims that the statement-against-interest hearsay exception did not apply here because Clark's proffered statement would not expose him to perjury charges. The Commonwealth maintains that Clark testified against Appellee in 1998, so the five-year statute of limitations for perjury had long since expired. Further, the Commonwealth contends that the PCRA court ignored that no corroborating circumstances provided the indicia of trustworthiness of Clark's statement. To the contrary, the Commonwealth submits that Clark's statement made it clear that it "was the opposite of trustworthy." (Commonwealth's Brief at 14). As such, the Commonwealth insists that the PCRA court erred in finding Clark's statement admissible. We disagree.

To obtain relief on a substantive claim of after-discovered evidence under the PCRA once jurisdiction is established, a petitioner must demonstrate both that the evidence would be producible and admissible at trial, and that the four prongs of the after-discovered evidence test are satisfied.

*Commonwealth v. E.E. Small*, 647 Pa. 423, 442, 189 A.3d 961, 972 (2018). Turning first to whether evidence is producible and admissible, the admissibility of a statement is an evidentiary question, which involves our well-settled standard of review: "Questions concerning the admissibility of evidence are within the sound discretion of the [PCRA] court, and this Court will not reverse the [PCRA] court's decision absent an abuse of that discretion." *Commonwealth v. Fitzpatrick*, 667 Pa. 447, 479, 255 A.3d 452, 471 (2021).

Hearsay is defined as an out of court statement that is offered into evidence to prove the truth of the matter asserted. Pa.R.E. 801(c)(1)-(2). Statements that meet the definition of hearsay are not admissible, unless they fall within an established hearsay exception. *Fitzpatrick, supra* at 479, 255 A.3d at 471. Pennsylvania Rule of Evidence 804 sets forth exceptions to the rule against hearsay for when the declarant is unavailable as a witness, and states in pertinent part:

**Rule 804.  Exceptions to the Rule Against Hearsay—
When the Declarant is Unavailable as a Witness**

**(a) Criteria for Being Unavailable.**  A declarant is considered to be unavailable as a witness if the declarant:

\* \* \*

(4) cannot be present or testify at the trial or hearing because of death…

\* \* \*

**(b) The Exceptions.**  The following are not excluded by the

rule against hearsay if the declarant is unavailable as a witness:

\* \* \*

(3) *Statement Against Interest*.   A statement that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(a)(4), (b)(3).

A statement against interest is often considered trustworthy if it subjects the declarant to criminal liability and a reasonable person would not make the claim unless it was true.  ***Commonwealth v. Randolph***, 582 Pa. 576, 587-88, 873 A.2d 1277, 1284 (2005), *cert. denied*, 547 U.S. 1058, 126 S.Ct. 1659, 164 L.Ed.2d 402 (2006).  "Before crediting as reliable a statement against penal interest, the court must consider the declarant's motive for making the statement and whether the surrounding circumstances indicate the statement is trustworthy."  ***Commonwealth v. Padillas***, 997 A.2d 356, 365-66 (Pa.Super. 2010), *appeal denied*, 609 Pa. 687, 14 A.3d 826 (2010) (citing ***Randolph, supra*** at 587–88, 873 A.2d at 1284).

Reliability is determined by referring to the circumstances in which the declarant gave the statement, not by reference to

other corroborating evidence presented at trial. **Commonwealth v. Robins**, 571 Pa. 248, 812 A.2d 514 (2002). Among the factors a court might consider in determining the reliability of inculpatory or exculpatory statements are:

the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

*Id.* at 267, 812 A.2d at 525–26.

**Commonwealth v. Cascardo**, 981 A.2d 245, 258 (Pa.Super. 2009), *appeal denied*, 608 Pa. 652, 12 A.3d 750 (2010).

"Pennsylvania has long recognized that a witness's admission to a crime is considered reliable and, therefore, admissible because its 'trustworthiness is safeguarded by the improbability that a declarant would fabricate a statement which is contrary to his own interests.'" **Commonwealth v. Little**, 246 A.3d 312, 324 (Pa.Super. 2021) (quoting **Commonwealth v. Colon**, 461 Pa. 577, 337 A.2d 554, 556 (1975)). Significantly, it is the possibility of

prosecution, not the likelihood of prosecution, which renders a statement against an individual's interest, and which lends weight to its admission. ***Id.*** (citing ***Commonwealth v. Statum***, 769 A.2d 476, 480 (Pa.Super. 2001), *appeal denied*, 566 Pa. 681, 784 A.2d 117 (2001)).

This Court recently addressed the issue of whether the statement against interest exception applied in ***Commonwealth v. Franklin***, 346 A.3d 812 (Pa.Super. 2025). There, this Court held that when an eyewitness recanted his 1980 trial testimony in 2016, the statement did not qualify as a statement against interest because the statute of limitations on perjury had run. ***Id.*** at 223-24. The Court specifically explained that the witness could not have been subject to either civil or criminal liability for stating that he had lied "because the statute of limitations on perjury had run. Thus, the second prong of the statement against interest exception to hearsay has not been met." ***Id.*** at 824. The ***Franklin*** Court further held that perjury at a first-degree murder trial did not constitute a felony in connection with a murder, which would otherwise have no limitations period for prosecution under 42 Pa.C.S.A. § 5551. ***Id.*** at 823 (explaining: "that the exception to the five-year statute of limitations for felonies committed 'in connection with' a murder is intended for felonies that occurred at the same time as a murder during the same criminal episode; that occurred as part of the same criminal scheme(s), plan(s), or transactions(s) as the murder; or that involved a common basis of operative facts as the murder").

Instantly, the PCRA court explained its evidentiary ruling concerning Clark's affidavit and proffered testimony, by way of Nixon,[7] as follows:

> Rule 804 takes applicable hearsay exceptions into account when the declarant is unavailable, most significantly when a declarant makes a statement that is so contrary to their interests, including but not limited to exposing them to criminal liability, that a reasonable person would not make such a statement unless it was true. **Clark's affidavit revealed that he could have faced criminal culpability if he did not falsely testify against** [**Appellee**] **at trial,** information that clearly fits the criteria of Rule 804.
>
> It is significant that Clark had passed away while visiting Pittsburgh, Pennsylvania a month prior to the evidentiary hearing, making him unavailable to testify. This would have potentially barred his affidavit at the evidentiary hearing. However, **it is clear to this court that when Clark proffered his initial affidavit, Clark was unaware that he was going to pass away and that, if he had lived, that he would potentially be subject to criminal liability**.[9] As a natural consequence, this court determined that Clark provided the information contained in his affidavit under such circumstances that supported the truthfulness of the information proffered.[10]
>
> > [9] This court would have found differently as to the veracity of the information provided by Clark if Clark had provided such information while knowing that he was going to pass away and thus avoid potential criminal liability. For example, if Clark had been suffering from a terminal illness and provided this information, then it could be inferred that Clark had no reason to be truthful in his affidavit because he knew he would pass away before facing any criminal liability for lying to police at Appellee's trial.
> >
> > [10] It is important to note that Clark initially provided his affidavit on August 5, 2019. Appellee, through his

_____

[7] The PCRA court found Nixon's testimony credible. (**See** PCRA Court Opinion at 3 n.3, 17).

attorney, filed the underlying PCRA Petition on January 8, 2020. The First Judicial District was shut down due to the COVID-19 Pandemic in March 2020. Clark could not have predicted that a global pandemic would cause delays and prevent Clark from testifying prior to his passing. It is evident that when Clark provided his affidavit that not only was the information contained within against Clark's own interest but that Clark had no way of knowing that the COVID-19 Pandemic would delay the evidentiary hearing from occurring until Clark had passed away. This court determined that these circumstances sufficiently bolstered the credibility of the information contained within Clark's affidavit for it to be considered.

(PCRA Court Opinion at 16) (internal citations omitted) (emphasis added).

The PCRA court further explained:

Clark's affidavit made several facts clear. Clark, at the age of 17, had already been charged and sentenced for firearms offenses. He was at a boot camp known as Vision Quest when homicide detectives picked him up and questioned him about Appellee's criminal matter. **Clark also stated that police told him that the gun Clark used in his own incident was used to kill Johnson and that, if Clark did not testify against Appellee at trial, that Clark would be charged with murder**. Taken to be accurate, it becomes evident that Clark, in his affidavit where he stated that he never received a firearm from Appellee, was drawing a more direct link between himself, Tucker, and the firearm used to kill Johnson. At trial, Clark testified that the murder weapon went from himself to Appellee, after which it is apparent that the murder weapon went from Appellee to Tucker. This separated Clark from Johnson's murder. However, in Clark's affidavit, Clark exonerates Appellee as the individual who controlled and provided the murder weapon, in essence stating that the murder weapon went directly from Clark to Tucker. **This removes the degree of separation that protected Clark from liability for Johnson's murder and would likely result in Clark facing culpability for providing the weapon**. As a natural consequence of this affidavit, Clark would no longer

be separated from Johnson's murder by a third party. This would absolutely be a statement against Clark's own interests and, ergo, adds reliability to Clark's affidavit.

(*Id.* at 12) (emphasis added).

On this record, we agree with the PCRA court's analysis that the statement against interest hearsay exception was applicable. Clark was unavailable to testify at the PCRA hearing due to his death a year earlier. However, Clark provided the information in his affidavit under circumstances that supported the truthfulness of the information proffered. Specifically, based on the circumstances surrounding Clark's trial testimony,[8] the record

_____

[8] The PCRA court expressly considered the following circumstances:

As stated, Clark was questioned by police in this matter when he was seventeen years old. Clark was taken by homicide detectives from his boot camp program and questioned regarding Johnson's murder. Clark was informed that Appellee had control over firearms and that refusing to testify against Appellee could have resulted in Clark facing murder charges. This sort of pressure understandably strengthened Clark's motive to testify falsely against Appellee at trial as Clark had just been convicted and was serving a sentence for an unrelated firearms offense. Based on these factors, even if this court felt that Clark did not prove that he was the victim of police misconduct, having heard the testimony this court determined that there was sufficient information presented in Clark's affidavit to prove that Clark was scared enough to have testified falsely against Appellee that it was the same gun used to murder Johnson in order to avoid facing any further consequences regarding his own firearms violations. Clark was a juvenile serving time for firearms violations and was understandably concerned about facing more serious charges as stated in his affidavit. Consequently, this court

*(Footnote Continued Next Page)*

reflects that when Clark provided his recantation testimony, Clark believed that he could have been implicated in Johnson's murder for having provided Tucker with the murder weapon. *See Little, supra*.

Unlike the facts in *Franklin, supra*, here, Clark's recantation did not solely subject him to perjury charges, which would have been barred by the statute of limitations. Rather, as the PCRA court makes clear, Clark's recantation might have subjected him to charges directly related to the murder of Johnson. Indeed, according to Clark, officers threatened as much when they questioned him initially, informing Clark that because the gun that Clark had used in a prior crime was used to kill Johnson, that police would charge him with murder if he did not testify against Appellee. (*See* PCRA Court Opinion at 12).

Pennsylvania law defines an accomplice as a person who, "with the intent of promoting or facilitating the commission of the offense" either "solicits such other person to commit it" or "aids or agrees or attempts to aid such other person in planning or committing it." 18 Pa.C.S.A. § 306(c)(1). Clark's recantation removed Appellee from the chain of possession of the firearm, such that the evidence could then reasonably suggest that Clark

_____

determined that the evidence presented by Appellee was credible and was sufficient to cast doubt on Clark's trial testimony.

(PCRA Court Opinion at 7-8).

provided the gun to Tucker, who used it to murder Johnson. Hence, Clark could possibly face criminal culpability for providing the murder weapon. As there is no statute of limitations for charges of being an accomplice to murder, even though Clark's statement recanted testimony made more than 20 years prior, the recantation statement "when made" was contrary to Clark's pecuniary interests. Pa.R.E. 804(b)(3)(A).

Therefore, because there could be a "**possibility of criminal prosecution**" as an accomplice for Clark providing the murder weapon, we agree with the PCRA court that Clark's recantation testimony satisfies the second prong of the statement against interest hearsay exception. *Little, supra* at 324 (emphasis added). Accordingly, on this record, we cannot say that the PCRA court abused its discretion in deciding that Clark's statement satisfied the statement-against-interest hearsay exception, such that this evidence would be producible and admissible at a new trial. *See* Pa.R.E. 804(b)(3); *E.E. Small, supra*; *Randolph, supra*; *Padillas, supra*.

We turn next to the second part of the Commonwealth's claim, that the PCRA court erred in determining that Clark's statement satisfied the PCRA's requirements for after-discovered evidence. Specifically, the Commonwealth argues that Clark's proffered statement would not have altered the outcome of trial. The Commonwealth stresses that Clark's trial testimony—which implicated only how and why Appellee could have had access to the murder weapon—would not exculpate Appellee or negate the eyewitness testimony

that Appellee pointed a gun at Johnson seconds before the murder. The Commonwealth highlights that co-defendant Tucker, not Appellee, was in possession of the gun at issue on the day of the shooting. The Commonwealth suggests that the evidence against Appellee at trial was straightforward and compelling. Specifically, the Commonwealth relies on eyewitness testimony from Houser, who testified that he saw Appellee and someone else step out of a vehicle each armed with guns and point their guns at the victim. The Commonwealth emphasizes that its theory at trial was that Tucker was the actual shooter responsible for Johnson's death. The Commonwealth insists that Clark's proffered recantation testimony was far from exculpatory, where Clark's trial testimony had merely established Appellee's access to a gun that Appellee did not even use in the murder. The Commonwealth highlights that Clark was not present at the shooting and did not testify to any details about the murder or Appellee's involvement in the killing.

In other words, the Commonwealth avers that Clark's recantation testimony did nothing more than recant Clark's prior testimony that he had returned a gun to Appellee; but it did not rebut eyewitness testimony that Appellee was present at the crime scene with a gun. Ultimately, the Commonwealth concludes that the PCRA court's award of a new trial was erroneous, and this Court must reverse. We disagree.

It is well settled that when considering a claim of after-discovered evidence involving recanted testimony, "an appellate court may not interfere

with the … granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion." ***Commonwealth v. Medina***, 92 A.3d 1210, 1219 (Pa.Super. 2014) (*en banc*), *appeal dismissed as improvidently granted*, 636 Pa. 77, 140 A.3d 675 (2016) (quoting ***Commonwealth v. McCracken***, 540 Pa. 541, 549, 659 A.2d 541, 545 (1995)) (brackets in original).

"[W]e have emphasized that, when addressing an after-discovered evidence claim premised on recantation testimony, 'the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole.'" ***E.E. Small, supra*** at 450-51, 189 A.3d at 977 (quoting ***Commonwealth v. D'Amato***, 579 Pa. 490, 523, 856 A.2d 806, 825 (2004)). "The deference normally due to the findings of the [PCRA] court is accentuated where what is involved is recantation testimony." ***Commonwealth v. Loner***, 836 A.2d 125, 141 (Pa.Super. 2003) (*en banc*), *appeal denied*, 578 Pa. 699, 852 A.2d 311 (2004). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court." ***Commonwealth v. Spotz***, 610 Pa. 17, 43-44, 18 A.3d 244, 259 (2011) (citation omitted).

To obtain relief on a substantive claim of after-discovered evidence under the PCRA, a petitioner must demonstrate: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not merely corroborative or

cumulative; (3) the evidence is not being used solely to impeach credibility; and (4) the evidence would likely result in a different verdict if a new trial were granted. **Commonwealth v. Pagan**, 597 Pa. 69, 106, 950 A.2d 270, 292 (2008), *cert. denied*, 555 U.S. 1198, 129 S.Ct. 1378, 173 L.Ed.2d 633 (2009). **See also** 42 Pa.C.S.A. § 9543(a)(2)(vi) (discussing claim of after discovered evidence as cognizable under PCRA; petitioner must establish "unavailability at time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced").

In this case, the Commonwealth argues only that Appellee could not satisfy the fourth prong,[9] claiming that the proffered evidence would not likely result in a different verdict if a new trial were granted. As this Court has explained:

> When evaluating whether a petitioner has established by a preponderance of the evidence that the after-discovered evidence would likely produce a different verdict, a court must examine the persuasiveness of the new evidence assuming the fact-finder believes it. [**Commonwealth v. Fiore**, 780 A.2d 704, 713-14 (Pa.Super. 2001), *appeal granted*, 568 Pa. 715, 797 A.2d 910 (2002), *appeal dismissed*, 572 Pa. 568, 817 A.2d 1080 (2003)]. This inquiry includes evaluations of (1) the nature of the new evidence; (2) whether, and to what extent, the new evidence is consistent or inconsistent with other trial

_____

[9] Upon review, we similarly conclude that Appellee's claim satisfies the first three elements. There is no question that the evidence was discovered after trial and could not have been discovered sooner. Further, Clark's statement is not merely cumulative or corroborative and is not being used to impeach credibility. **See Pagan, supra**.

testimony; and (3) whether, and to what extent, the new evidence is consistent or inconsistent with documentary evidence. *Id.*

*Commonwealth v. Payne*, 210 A.3d 299, 302 (Pa.Super. 2019) (*en banc*),

*appeal denied*, 655 Pa. 591, 218 A.3d 1201 (2019).

Our Supreme Court has explained the extent of review required for an

after discovered evidence claim as follows:

> Several case-specific factors inform the analysis of whether the petitioner has established by a preponderance of the evidence that the after-discovered facts would likely produce a different result. In [*Commonwealth v. Bulted*, 443 Pa. 422, 279 A.2d 158, 159-62 (1971),] for example, the Court reviewed all of the trial evidence, as well as the Commonwealth's closing argument, in order to assess the impact of the after-discovered evidence. In *Commonwealth v. Mount*, [435 Pa. 419, 257 A.2d 578, 582 (1969),] the Court analyzed the impact of the after-discovered evidence against the Commonwealth's theory of the case. In *Commonwealth v. Cooney*, [444 Pa. 416, 282 A.2d 29, 31 (1971),] the Court held that after-discovered evidence entitled the petitioner to relief because it supported and confirmed the petitioner's trial testimony and rendered the defense theory much more plausible.
>
> This precedent demonstrates that the only way to assess the likelihood that after-discovered evidence will produce a different result is to review the totality of all of the trial circumstances, including, but not limited to, the trial evidence and the parties' closing arguments. When the petitioner establishes by a preponderance of the evidence that the new facts are "of such a nature and character that a different verdict will likely result if a new trial is granted," then the petitioner is entitled to relief. [*Commonwealth v. Valderrama*, 479 Pa. 500, 388 A.2d 1042, 1045 (1978) (holding that the after-discovered evidence provided substantial support for the defendant's alibi defense and that a different verdict would likely result)].

*Commonwealth v. Murchison*, ___ Pa. ___, ___, 328 A.3d 5, 17 (2024)

- 22 -

(footnotes omitted).

"Finally, we note that the Supreme Court does not require that a petitioner establish that the after-discovered evidence proves his innocence beyond a reasonable doubt." **Payne, supra** at 304 (citations omitted). "Rather, a petitioner must only establish by a preponderance of the evidence that the exculpatory after-discovered evidence 'would have changed the outcome of the trial if it had been introduced.' 42 Pa.C.S.[A.] § 9543(a)(2)(vi)." **Id.**

In **Fiore, supra**, this Court considered whether a witness's recantation testimony would likely compel a different verdict. The witness was allegedly the middleman in a murder-for-hire conspiracy, and provided the link between the appellant, the victim, and the men hired to kill the victim. There, the PCRA court found that the witness's testimony would not likely have changed the outcome of trial. Nevertheless, on appeal, this Court concluded that the witness's testimony contradicted the Commonwealth's case-in-chief and, because the witness provided the links of the conspiracy, his testimony, if believed by a jury, would likely have changed the outcome of the trial. **See id.** at 714. Therefore, this Court reversed the order of the PCRA court and remanded for a new trial.

This Court also considered whether evidence of a witness's recantation would likely compel a different verdict in **Medina, supra**. There, the petitioner was convicted of murder based on the testimony of two witnesses.

One witness recanted and claimed that a detective had coerced his testimony, and the petitioner sought relief under the PCRA based on after-discovered evidence. The PCRA court found the testimony of the recanting witness credible and granted petitioner a new trial. *See id.* at 1216. On appeal, this Court reasoned that the recantation testimony not only repudiated the witness's initial testimony, but also undermined the credibility of the other witness who, the Court noted "ha[d] well-documented credibility issues." *Id.* at 1220. This Court explained that in a new trial, if the jury believed the recantation witness's testimony, the "Commonwealth would be left with shaky circumstantial proof." *Id.* Accordingly, this Court explained that because the PCRA court found the recantation testimony credible and the eyewitness's PCRA testimony incredible, "the PCRA court did not abuse its discretion in concluding that there was a strong likelihood that a different verdict would be reached upon retrial." *Id.* (footnote omitted).

Here, the PCRA court explained in its opinion that it found Clark credible and that his recantation was significant in light of the evidence as a whole. The court explained that

> in Clark's affidavit, Clark exonerates Appellee as the individual who controlled and provided the murder weapon, in essence stating that the murder weapon went directly from Clark to Tucker. This removes the degree of separation that protected Clark from liability for Johnson's murder and would likely result in Clark facing culpability for providing the weapon.

(PCRA Court Opinion at 12).

The PCRA court further concluded that Clark's recantation would likely change the outcome of trial, reasoning:

> Critical to this was the role Clark played at trial, testifying that he received the same firearm used in the murder from Appellee a month before Johnson's murder took place. This testimony was designed to paint Appellee as someone who had control over firearms, lent firearms to people, and lent the very same firearm used in the murder to Clark, a fact that was crucial to convicting Appellee at a trial where it had been determined that Appellee did not personally shoot Johnson. Appellee's mere presence at the scene of the shooting with nothing more would likely have been insufficient for a jury to have determined that Appellee had conspired in and was therefore guilty of Johnson's murder. Consequently, testimony that Appellee had control over the firearm used in Johnson's murder and another shooting was critical information in the jury's determination of Appellee's guilt.
>
> *    *    *
>
> [T]he effect of Clark's affidavit would require that Houser's trial testimony stand on its own merit. At trial, the Commonwealth used Houser's testimony to prove that Appellee was present at Johnson's murder. However, Houser testified that he did not see exactly who shot Johnson. Clark's trial testimony, therefore, was crucial to tie Appellee to the murder: through ballistic evidence at trial, it was proven that both shots that killed Johnson came from Tucker's gun. Consequently, Appellee was not directly involved in murdering Johnson. **Clark's testimony provided the critical link between Appellee and Johnson's murder.** Without Clark, the Commonwealth's sole witness would have been Houser, and Houser neither saw who shot Johnson nor tied Appellee to the weapon used in Johnson's murder. **By himself, Houser's testimony would have likely been insufficient to prove Appellee's guilt at trial.**

(***Id.*** at 7) (emphasis added). The PCRA court continued:

> Clark's affidavit essentially alleged that homicide detectives

told Clark to testify in such a way that tied Appellee to Johnson's death or else Clark himself would be facing murder charges. Such information, if believed at Appellee's trial, would be convincing evidence that Clark was coerced into falsely testifying against Appellee, namely that Appellee had control over and loaned to Clark the same gun that would later be used to murder Johnson. This coercion, if believed by the jury, could have cast enough reasonable doubt on Appellee's matter for the jury to have found Appellee not guilty of having any involvement in Johnson's murder. The Commonwealth's theory of Appellee's case was not that Appellee himself shot Johnson, but rather that Appellee was present at the scene with Tucker, who admittedly did shoot Johnson, and that Appellee conspired with Tucker to murder Johnson. **Part of this theory was that Appellee provided the murder weapon, hence why Clark's testimony was crucial to their case of proving Appellee's participation in a conspiracy. If Clark had not testified to such information at trial or if Clark's affidavit had been available at trial, it is clear that the outcome of Appellee's trial would potentially have been very different.**

(**Id.** at 13-14) (emphasis added).

Similar to the recanted testimony in **Fiore**, Clark's trial testimony concerning the murder weapon played a central role in the Commonwealth's case-in-chief. At Appellee's trial, the Commonwealth relied on Clark's trial testimony to provide the connection between Appellee and the gun used in the murder. The Commonwealth argued that although Appellee was not the shooter, Appellee had provided the gun (which Clark testified he returned to Appellee) that Tucker used to shoot Johnson. During the Commonwealth's opening statement, the prosecutor explained that it would present evidence that one of the two guns at the scene left behind two shell casings, and that the same weapon was used by Shawn Clark in a shooting on Gratz Street

- 26 -

three weeks earlier. (*See* N.T. Trial, 11/6/98, at 24-25). The Commonwealth emphasized that Clark had obtained the weapon from Appellee, and that after the Gratz Street shooting, Clark returned the gun to Appellee. (*See id.* at 25). During trial, the Commonwealth introduced Clark's testimony, where he stated that Appellee had given him a gun on the day of the Gratz Street shooting, and that Clark returned the gun to Appellee after that shooting. (*Id.* at 96-98). In the prosecutor's closing remarks, he emphasized the importance of Clark's having returned the gun to Appellee, explaining that the fact that the gun was returned formed a basis for the jury to conclude that it was Appellee's gun to handout. (*See* N.T. Trial, 11/12/98, at 127). The prosecutor further stated that although the death bullets came from Tucker, the "gun that was handed out for use to [Clark] three weeks before now demonstratively has been handed over for use to … Tucker in this case," and that there was direct evidence that the gun fired by Tucker belonged to Appellee. (*See id.* at 144-45).

Ultimately, Clark's recantation of that testimony removes from the Commonwealth's theory of the case any evidence that Appellee had possession of the firearm prior to the shooting. As noted, the PCRA court found Clark's recantation testimony to be credible, and we give such credibility determinations great deference. *See Spotz, supra*; *Medina, supra*. We emphasize that this Court may not interfere with the PCRA court's award of a new trial where the sole ground is the recantation of a state witness, unless

there has been a clear abuse of discretion.  ***See id.***  As we discern no clear abuse of discretion on the part of the PCRA court in making its credibility determination, this Court is bound to accept it.

Additionally, viewing the trial evidence as a whole and considering the Commonwealth's theory of the case and the arguments of the parties, the record supports the PCRA court's analysis that Appellee has established by a preponderance of the evidence that the after-discovered fact of Clark's recantation would likely compel a different verdict upon retrial.  ***See Murchison, supra***.  Accordingly, we affirm the order of the PCRA court granting Appellee a new trial based on the after-discovered evidence of Clark's recantation.

Order affirmed.

Judge Sullivan notes dissent.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/17/2026